**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

JOHN DOE,                                                      Case No.: 2:26-cv-02472-MAK

Plaintiff,

v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

Defendant.

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO THE COURT'S APRIL 20, 2026**

**ORDER TO SHOW CAUSE**

Plaintiff respectfully submits this Memorandum of Law to demonstrate "good cause" to

proceed under pseudonym pursuant to the criteria set forth in *Doe v. Megless*, 654 F.3d 404

(3d Cir. 2011). As detailed below, the extraordinary risks of professional debarment and the

threat of targeted physical retaliation constitute a "reasonable fear of severe harm" that

decisively outweighs the customary public interest in open judicial proceedings.

Furthermore, Plaintiff notes that the District of Massachusetts recently granted

pseudonymity in a virtually identical Title VI action, *Doe v. Harvard*, Case No. 1:26-cv-

10486-ADB.

Plaintiff incorporates by reference the facts and arguments set forth in his Motion to

Proceed Under Pseudonym ("Motion for Pseudonym") (ECF 2) and provides this

supplemental memorandum to address the Court's specific concerns raised in its Order dated April 20, 2026.

## I. PLAINTIFF HAS A REASONABLE FEAR OF SEVERE HARM

Forced identify disclosure will cause Plaintiff a reasonable fear of severe harm. Specifically, "disclosure" will result in three harms to Plaintiff: (1) permanent professional debarment, (2) social stigma, and (3) threat of physical violence. Harm (1) by itself constitutes a reasonable fear of severe harm, as does harm (3).

At the very least, these three harms considered *in combination* constitute a reasonable fear of severe harm. As the court recognized in *Doe v. Hartford Life & Accident Insurance Co.*, 237 F.R.D. 545, 550 (D.N.J. 2006), a court must evaluate the cumulative, intersecting impact of economic harm, social stigma, and threats to safety.

### A. Permanent Professional Debarment

In Plaintiff's industry of employment, the human resources departments (who are ultimately responsible for hiring) are led and disproportionately staffed by Jewish women. These "HR Jews" already discriminate against non-Jewish White males such as Plaintiff. Motion for Pseudonym Section III.3 notes that Plaintiff's coworkers receiving early promotions disproportionately have Jewish names. Plaintiff, who is trained in statistics, has computed the probability of such an event occurring by chance to be on the order of 1 in a billion; In comparison, in criminal trials for crimes such as rape or murder, the probability of a false positive result DNA evidence is estimated by experts to be on the order of 1 in a thousand.  Furthermore, many high-level managers at large employers have publicly stated

their organizations policies prohibit the hiring of White males. Some of these employers implement policies  whereby a White male could be hired only if an 'exception' were granted by a high-level manager at the organization – to Plaintiff's knowledge, these 'exceptions' were given exclusively to Jews. Considering the willingness of HR Jews to discriminate against non-Jewish White males, it is reasonable to conclude that Plaintiff would be completely debarred from traditional employment after being named as a Plaintiff alleging favored treatment of Jews in university admissions.

Plaintiff has considered establishing his own firm as a work-around to discrimination. But emerging firms in Plaintiff's industry nearly always require investment from venture capitalists (VCs). Just as HR departments are run by HR Jews, VC firms are run by "VC Jews". VC firms usually don't invest in firms owned by non-Jewish White males.

Disclosure would result in Plaintiff's total, permanent debarment from traditional employment and entrepreneurship, depriving Plaintiff of his livelihood. Courts recognize that the deprivation of livelihood satisfies the severe harm threshold relevant to disclosure (see, e.g., *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 [9th Cir. 2000]).

**B. Disclosure Will Cause Plaintiff Social Stigma**

Federal courts recognize that social stigma serves as a critical factor in evaluating a plaintiff's right to anonymity, particularly when it intersects with a threat to their livelihood. *See, e.g., Hartford Life, 237 F.R.D. at 550*. In *Hartford Life*, the court acknowledged that severe social stigma can erode a professional's prospects of returning to work within their

industry. In the matter presently before the Court, the social stigma from disclosure would exacerbate both the threat to livelihood *and* the threat to safety faced by Plaintiff.

The social stigma Plaintiff faces in the present case is markedly more severe than that identified in *Hartford Life*. Disclosure in *Hartford Life* would have caused the plaintiff social stigma associated with his mental illness. Plaintiff's Complaint Section III.C (ECF 1) makes inflammatory claims; People making such claims face enormous social stigma, commonly being branded as 'antisemitic', 'Nazi', 'racist', 'misogynist', 'homophobic', 'crackpot', or 'unpatriotic'. In contemporary times, to call someone an 'antisemite' or 'Nazi' is to mean that they are the pinnacle of evil. Few (if any) civil actions subject a plaintiff to such a dehumanizing stigma. This social stigma acts as the catalyst for both the subsequent injuries to Plaintiff's livelihood (see Subsection I.A) and the threat to his safety (see Subsection I.C).

## C. Disclosure Will Threaten Plaintiff's Physical Safety

While judicial evaluations of safety threats frequently center on potential retaliation directly from a defendant, the standard for pseudonymity is not so narrowly restricted. Under *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011), a court must look broadly at the risk of severe harm, including risk of digital harassment and violence from non-parties.

Motion for Pseudonym Section III.5 claims President Jack Kennedy, and possibly his family members, were murdered by agents of the Mossad, Israel's intelligence agency, to obstruct Kennedy's opposition to the interests of the Jewish Supremacists. Today, Mossad is still active and apparently very powerful in the US. Jews Jeffery Epstein and Ghislaine Maxwell,

likely Mossad agents, appear to have implemented a vast sex trafficking "honeypot" conspiracy to blackmail influential people.

Proceeding by pseudonym deters Jewish agencies from murdering Plaintiff because, if Plaintiff were murdered, proceeding by pseudonym narrows the potential culprits.

Plaintiff may have already survived an assassination attempt by Jewish agents. Through a series of unlikely events, seemingly contrived by apparently conspiring Jews, Plaintiff was enticed by an attractive, busty Jewess and wet his mouth with a drink of partially unknown provenance. Hours later, Plaintiff experienced overwhelming fatigue and 'twilight consciousness' for hours – an event never experienced by Plaintiff prior or since. Plaintiff suspects he was poisoned by Jews. (Plaintiff may have targeted by Jewish agencies for his involvement as an organizer and prolific contributor to online communities critical of Jews, as well as his communication with the head writer for a cable news show whose host is now the world's foremost critic of Israel.)

Disclosure is also likely to result in acts of violence from Jewish extremists or political activists. The dehumanizing stigma described in Section I.B has radicalized many people to acts of violence. Far-right extremist Nick Feuntes, who publicly makes criticisms of Jews nearly as inflammatory as those made by Plaintiff, has been the repeated target of apparent acts of attempted violence. In one instance, Jewish extremist Marla Rose accosted Fuentes at his home. In another instance, murderer John Lyons attempted an armed invasion of Fuentes's home before being killed in a shootout with police. The home of another public critic of Jews, James Fishback, was possibly attacked by an arsonist.

Disclosure presents a safety threat not only to Plaintiff, but to Plaintiff's family. The Jews are notorious, vicious murderers of the families of those who oppose their Jewish interests. In Palestine, Jews murder the families of their opposers in targeted attacks, including attacks on small children. When Iran retaliated to deter the Palestinian genocide, the Jews, with the assistance of the US military, murdered the families of Iranian officials in attacks, some attacks apparently targeting small children.

## II. THE BALANCE OF INTERESTS FAVORS ANONYMITY

### A. No Prejudice to Defendant

There is no prejudice to the University of Pennsylvania by proceeding under a pseudonym. Plaintiff has already disclosed his identity to the Court under seal (ECF 7). Plaintiff will provide his identity to Defendant's counsel for the purposes of discovery and litigation.

### B. The Disclosure is a "Bell That Cannot Be Unrung"

The Third Circuit recognizes that some privacy interests, once breached, cannot be restored. Anonymity is a unique right because "the bell cannot be unrung": once Plaintiff's name is placed on the public docket, the threats of harm discussed above become permanent. Because a denial of pseudonymity is a "collateral order" causing irreparable harm before a judgment can be reached, the Court should err on the side of protection.

### C. The Public Interest is in the Merits, Not the Name

The public's legitimate interest in this case lies in the admissions policies of a major institutional recipient of federal funds and the Court's eventual ruling on Title VI compliance. The specific name of the Plaintiff adds no value to the public's understanding

of these legal issues. The public interest is fully served by access to the legal arguments, the evidence (redacted where necessary), and the Court's ultimate decision.

## D. The Threat of Harm and the "Chilling Effect" of Disclosure

The public interest in open litigation is outweighed alone by Plaintiff's reasonable fear of severe harm (as described in Section I), not to mention the factors outlined in Sections II.A–C above. More important than the threat of violence to the individual Plaintiff is the profound "chilling effect" disclosure would have on civil rights litigation. Fearing harm, future potential plaintiffs would be dissuaded from litigating their civil rights if they knew they could not do so anonymously. Permitting pseudonymity ensures that the courthouse doors remain open to citizens who would otherwise be too intimidated to seek justice.

## CONCLUSION

**WHEREFORE**, Plaintiff respectfully requests that the Court find that he has demonstrated "good cause" and a "reasonable fear of severe harm" under *Doe v. Megless*, and accordingly **GRANT** Plaintiff's request to proceed under pseudonym and **DIRECT** the Clerk of Court to issue the summons as requested in the Court's April 20, 2026 Order.


Dated: May 16, 2026

/s/ John Doe
John Doe, Plaintiff pro se
PO BOX 151133
Los Angeles, CA
90015