**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

JOHN DOE,
Plaintiff,

v.

THE TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA,

Defendant.

Case No. 2:26-cv-02472-MAK

# FIRST AMENDED COMPLAINT

Plaintiff John Doe, proceeding pro se and under pseudonym pursuant to this Court's Order of August 24, 2026 (ECF 26), alleges as follows.

## I. NATURE OF THE ACTION

1. This action arises from Defendant's consideration of race and sex in admission to the full-time MBA program of the Wharton School. Plaintiff applied for admission in the 2023-24 cycle and was denied.

2. Plaintiff alleges that Defendant's admissions practices confer advantage on applicants of Jewish ancestry, homosexuals, and females, thereby disadvantaging non-Jewish White heterosexual males.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and the events giving rise to the claims occurred in this District.

## III. PARTIES

5. Plaintiff John Doe is an adult individual residing in California. Plaintiff resided in California at all times relevant to this action, including at the time he applied for admission. Plaintiff is a non-Jewish White heterosexual male.

6. Defendant The Trustees of the University of Pennsylvania ("Penn") is a private university located in Philadelphia, Pennsylvania..

7. The Wharton School ("Wharton") is a school of the University of Pennsylvania and is not a separately incorporated entity. Its MBA program is administered under Penn's institutional authority.

## IV. THE HISTORICAL ORIGIN OF DISCRIMINATORY ADMISSIONS IN THE U.S.

8. Through the first decades of the twentieth century, the selective American universities from which contemporary admissions practice descends admitted undergraduates principally on the basis of competitive entrance examination. Admission turned on measured performance and little else.

9. In 1911, the Harvard Faculty of Arts and Sciences voted to supplement that examination system with an alternative route to admission based on an approved secondary school course. The express purpose of the change was to increase enrollment from outside New England and

from public high schools, whose students were less likely to have been prepared for the entrance examinations.

10. Under that regime, Jewish enrollment at Harvard College rose from approximately 10 percent in 1909 to more than 27 percent by 1925. Comparable increases occurred at Yale and Columbia.

11. In 1922, Harvard directed its statisticians to count the Jewish students enrolled since 1900. The resulting report classified each student as J1 (a known Jew), J2 (probably Jewish), J3 (possibly Jewish), or Other. The institution thus maintained a systematic ethnic classification of its own student body as a predicate to the policy that followed.

12. On the basis of that count, Harvard President A. Lawrence Lowell proposed an explicit numerical cap on Jewish enrollment, which he set at approximately 15 percent. The faculty rejected the proposal.

13. Harvard thereafter achieved the same result through facially neutral means. It introduced and expanded assessments of applicant "character" and "leadership," alumni interviews, the personal essay, the applicant photograph, geographic distribution requirements, and preference for the sons of alumni. Yale and Princeton adopted parallel instruments.

14. Jewish enrollment at Harvard fell from more than 27 percent in 1925 to approximately 15 percent the following year, and remained near that level for roughly two decades. Yale and Princeton experienced comparable declines.

15. The same institutional records established that Jewish students were outperforming their non-Jewish classmates academically. Criteria weighted more heavily toward measured academic

performance would therefore have increased the Jewish proportion rather than reduced it. The discretionary criteria were adopted not to identify academic merit but to override it.

16. The historical record of these decisions is documented in the administrative archives of the institutions themselves. See Jerome Karabel, The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton (2005); Marcia Graham Synnott, The Half-Opened Door: Discrimination and Admissions at Harvard, Yale, and Princeton, 1900–1970 (1979); Harold Wechsler, The Rationale for Restriction: Ethnicity and College Admission in America, 1910–1980, 36 Am. Q. 643 (1984).

17. Holistic admissions was therefore not a reform later susceptible to misuse. It was designed as an instrument for maximizing administrative discretion, so that an institution could produce a chosen demographic result while attributing that result to individualized judgment rather than to policy.

18. The instrument is indifferent to the identity of its beneficiary. Discretion of this kind produces whatever composition the institution wielding it prefers, and it renders that preference unreviewable by disguising policy as case-by-case assessment.

## FACTUAL ALLEGATIONS

### V. THE PLAINTIFF'S APPLICATION AND DENIAL

19. On or about April 2, 2024, Plaintiff submitted an application for admission to the full-time Wharton MBA program for the 2023-24 admissions cycle. April 2, 2024 was the Round 3 application deadline for that cycle.

20. Plaintiff's application included a GMAT (Graduate Management Aptitude Test) score in the top one percent of test takers. According to Wharton's report of students admitted to the class of 2027, the average admitted student who submitted a GMAT score scored only in the approximately top 3.5% of test takers. (Plaintiff applied to the class of 2026, but Wharton does not currently publish test score data on the class of 2026.) Wharton did not report the percentage of admits who submitted a GMAT score.

21. Plaintiff earned a bachelor's degree in a rigorous science discipline from a state university with a grade point average below that of the average admit to the Wharton MBA program, but within the normal range for applicants admitted to MBA programs comparable to Wharton's. Wharton did not report the range of admit grade point averages.

22. At the time he applied, Plaintiff had worked professionally for a time within the range of admitted applicants. Plaintiff's work experience included unique and impressive achievements.

23. Plaintiff was qualified for admission to the Wharton MBA program.

24. On April 19, 2024, Penn denied Plaintiff's application without interviewing him.

25. Penn has not disclosed the criteria applied to Plaintiff's application, the identity of the persons who evaluated it, or what information within it was before those persons.

26. Removed.

## VI. PENN'S RECEIPT OF FEDERAL FINANCIAL ASSISTANCE

27. Penn receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., including federal student financial aid administered under Title IV of the Higher Education Act.

28. Penn's receipt of federal financial assistance extends to programs and activities conducted by the Wharton School.

## VII. PENN'S OWN RECORDS REFLECT THAT IT CONSIDERED APPLICANTS' RACE

29. The Common Data Set ("CDS") is a standardized annual reporting instrument developed by the Common Data Set Initiative, a collaboration of the College Board, Peterson's, and U.S. News & World Report. Participating institutions complete the CDS themselves and publish the completed form. Penn publishes its completed CDS for each academic year on the website of its Office of Institutional Research & Analysis.

30. Section C7 of the CDS requires an institution to rate the relative importance of enumerated academic and nonacademic factors in its first-year admission decisions, using the categories "Very Important," "Important," "Considered," and "Not Considered." In editions of the CDS through the 2022-23 academic year, the enumerated nonacademic factors included "Racial/ethnic status.".

31. In its published CDS for the 2022-23 academic year, Penn rated "Racial/ethnic status" as "Considered" in first-year undergraduate admission decisions. That entry is Penn's own characterization of its own admissions practice, made in Penn's own words, in a document Penn prepared and published.

## VIII. PENN'S ACKNOWLEDGMENT THAT ITS PRACTICES REQUIRED CHANGE

32. On June 29, 2023, the Supreme Court held in Students for Fair Admissions, Inc. v. President & Fellows of Harvard College, 600 U.S. 181 (2023), that the race-conscious admissions programs at Harvard College and the University of North Carolina violated the Equal Protection Clause and Title VI of the Civil Rights Act of 1964.

33. On the same day the decision issued, Penn's President and Provost published a statement to the university community addressing the ruling. In that statement, Penn described universities such as itself as having previously been permitted to consider an applicant's race as one factor among many in holistic admissions review.

34. In the same statement, Penn stated that the decision "will require changes in our admissions practices."

35. Penn's statement that the decision would require changes to its own admissions practices supports the inference that Penn's admissions practices, as they existed on June 29, 2023, were race-conscious in a manner the decision rendered impermissible. A practice that did not consider race would have required no change.

36. Penn did not, in that statement or contemporaneously with it, identify any specific change it intended to make to its admissions practices.

## IX. PENN HAS NOT DISCLOSED THE SUBSTANCE OF ANY CHANGE

37. The 2023-24 edition of the Common Data Set template removed "Racial/ethnic status" from the enumerated factors in Section C7. Penn's published CDS for the 2023-24 academic year accordingly contains no entry for that factor. The absence of the entry reflects a change to the reporting instrument and is not an affirmative representation by Penn regarding its own practice.

38. Notwithstanding its acknowledgment that the decision would require changes to its admissions practices, Penn has never publicly identified what those changes were. Penn has not stated what was altered, when any alteration took effect, which admissions offices or degree programs any alteration applied to, or what criteria replaced those previously used. Penn has not published any post-decision admissions policy, procedure, guidance, or training material describing how applicants' race is or is not treated in its admissions processes.

39. Penn has therefore publicly acknowledged that its prior admissions practices required change, while withholding any description of the change. The particulars of Penn's current admissions practices are within Penn's exclusive possession and control and are not ascertainable from any public source.

## X. PENN’S WITHHOLDING OF CORRECTED DEMOGRAPHIC DATA

40. In October 2024, a University publication reported that demographic figures published by the Wharton School showed a decline in the percentage of students from historically underrepresented groups in its most recent undergraduate and MBA classes.

41. Following publication, a Wharton spokesperson stated that the School had identified inconsistencies between the methodologies used to calculate the figures for the two class years compared, rendering year-over-year comparison inaccurate.

42. Wharton did not publish recalculated figures. When asked to provide the corrected demographic information, the spokesperson declined and directed the publication to Penn's University-wide class profile.

43. Wharton further stated that future demographic data would be reported through the annually released University-wide class profile, which contains less information than the school-level data Wharton had previously made publicly available.

44. Penn published demographic figures, disclaimed their accuracy, declined to provide corrected figures when asked, and reduced the granularity of its subsequent public reporting. Penn has not stated what the corrected figures were.

## XI. NO PUBLIC DATA DESCRIBES WHARTON MBA ADMISSIONS CRITERIA

45. The Common Data Set reports on first-time, first-year undergraduate admission. It does not report on admission to graduate or professional programs, including the Wharton School's full-time MBA program.

46. Penn does not publish, and is not required by the Common Data Set Initiative to publish, comparable data regarding the criteria used in Wharton MBA admissions. No standardized public disclosure describes the relative importance of any factor, including race, in Wharton MBA admission decisions.

## XII. PENN ALTERED ITS DESCRIPTION OF THE USE OF DEMOGRAPHIC DATA WHILE CONTINUING TO COLLECT IT

47. Prior to June 29, 2023, the demographic section of Penn's graduate application included a disclosure stating that the requested information would be used to evaluate the effectiveness of Penn's recruitment efforts and to facilitate selection of a diverse student body, and stating that Penn wished to know how the applicant's background, work and life experiences, interests, culture, socioeconomic status, and race and/or ethnicity would contribute to the diversity of the incoming class.

48. In the 2023-24 admissions cycle, the same disclosure omitted the phrase "and to facilitate selection of a diverse student body" and omitted the words "race and/or ethnicity." The remainder of the disclosure was materially unchanged.

49. Both versions stated that the information was confidential and voluntary and that answering a question or omitting an answer would not influence the University's decision on admission.

50. Removed.

51. Notwithstanding the deletions described in ¶ 48, Wharton's MBA Application Guide for that cycle lists "Ethnicity (optional)" among the items collected in the Biographical Information section.

## XIII. PENN SOLICITS INFORMATION FROM WHICH RACE, SEX, AND SEXUAL ORIENTATION MAY BE INFERRED

52. Wharton's MBA Application Guide for the 2023-24 cycle states that every application to the full-time MBA Program is read by two people with no knowledge of the other reader's feedback.

53. On the application for the 2023-2024 cycle, Defendant required every applicant to state his or her sex.

54. The Application Guide directs applicants to address their personal, professional, and academic background in a required essay describing their intended contributions to the Wharton community. The application separately provides fields for community honors and for extracurricular activities and community engagements, each with a description.

55. The Personal Information section of the Wharton MBA application requests the first and last name of the applicant's spouse, spouse-to-be, or partner, together with that person's country, city, college or colleges, degrees, current employer, and current position. The application also requests the names, educational institutions, and employment information of the applicant's parents or guardians.

56. Information of the kind described in ¶¶ 53, 54, and 55 permits inferences as to the race, sex, and sexual orientation of the applicant and of the applicant's family members.

57. Penn has not disclosed the existence of any procedure by which information bearing on an applicant's race, sex, or sexual orientation is withheld from readers evaluating applications for admission.

58. Commercially available software tools are capable of redacting from application materials information from which race, sex, and age may be inferred. Upon information and belief, Penn employs no such tool in its MBA admissions process.

## XIV. WHARTON'S RACE-LINKED FELLOWSHIP MATERIALS

59. Wharton maintains a page on its corporate and recruiter website describing scholarship and fellowship opportunities. That page describes the Howard E. Mitchell Fellowship as a pooled fund for exceptional students from underrepresented backgrounds who receive full tuition and engage in leadership programming.

60. Removed.

61. That page hyperlinks to a document published by Wharton and hosted on Wharton's domain, which states that partnering with corporations and foundations allows Wharton to give annually ten merit-based, full-tuition awards to extraordinary students, with a preference for underrepresented groups identified as African Americans, American Indians, Hispanics and women.

62. Wharton's current MBA financial aid materials do not describe the Howard E. Mitchell Fellowship or its eligibility criteria. Those materials describe a Wharton Fellowship Program for which all admitted students are considered based on the application for admission, with awards offered in the admission and financial aid letter.

63. Penn has not stated whether the criteria described in ¶ 48 were changed, when any change took effect, or what criteria currently govern the award.

64. Wharton identified and selected, from among its own applicants, the recipients of an award available only to women.

## XV. WHARTON'S PARTICIPATION IN IDENTITY-BASED APPLICANT PROGRAMMING

65. Wharton Out for Business ("O4B") is a student organization of the Wharton School serving LGBTQ+ MBA students. O4B maintains a public website at whartono4b.com.

66. O4B's website states that Wharton attends the Pre-MBA Admissions Summit held by Reaching Out MBA ("ROMBA") each year and describes the conference as including a networking session with current LGBTQ+ MBA students, panels with school admissions officers, and a business school expo with other MBA programs.

67. Wharton presented at the ROMBA Pre-MBA Admissions Summit held on or about August 21, 2024.

68. O4B's website describes programming for prospective applicants including sessions it identifies as "Official AdCom Events," offers applicants the opportunity to speak with a "Queer Admissions Fellow," and directs applicants requiring assistance to an electronic mail address of the Wharton MBA admissions office.

69. Removed.

70. O4B's website further states that designating oneself as LGBTQ+ on a Wharton MBA application will not positively or negatively affect one's chance for admission, that such information is not shared with anyone outside of Admissions, and that the information is treated as confidential.

## XVI. CAUSES OF ACTION

COUNT I — Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

71. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

72. Title VI provides that no person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d.

73. Penn receives federal financial assistance. Its MBA program is a program or activity within the meaning of Title VI.

74. Plaintiff is non-Jewish White.

75. Penn intentionally considered applicants' race in evaluating applications for admission to the Wharton MBA program during the 2023-24 admissions cycle.

76. Penn considered Plaintiff's race in evaluating his application, and Plaintiff was denied admission on the ground of his race.

77. Plaintiff was thereby excluded from participation in, denied the benefits of, and subjected to discrimination under a program or activity receiving federal financial assistance.

78. As a direct and proximate result, Plaintiff suffered pecuniary injury including an application fee of $275 and examination fees of $500, together with diminished earning capacity in an amount to be determined at trial.

COUNT II — Violation of 42 U.S.C. § 1981

79. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

80. Section 1981 guarantees to all persons the same right to make and enforce contracts as is enjoyed by white citizens, and protects white persons as well as members of racial minorities. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273 (1976). Section 1981 reaches a private school's refusal to contract on racial grounds. See Runyon v. McCrary, 427 U.S. 160 (1976).

81. Plaintiff is a member of a racial group.

82. Admission to and enrollment in Penn's MBA program, in exchange for tuition, would have created a contractual relationship between Plaintiff and Penn.

83. Penn intentionally discriminated against Plaintiff on the basis of race in refusing to enter into that contractual relationship.

84. But for Plaintiff's race, Penn would not have denied his application.

85. Removed.

86. As a direct and proximate result, Plaintiff suffered the injuries described in ¶ 78, together with non-pecuniary injury.

COUNT III — Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681

87. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

88. Title IX provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). Title IX is enforceable

through an implied private right of action, and damages are available for intentional violations. See Cannon v. Univ. of Chicago, 441 U.S. 677 (1979); Franklin v. Gwinnett Cnty. Pub. Schs., 503 U.S. 60 (1992).

89. Penn's MBA program is an education program or activity receiving federal financial assistance.

90. Plaintiff is male.

91. The Wharton MBA application required each applicant to state his or her sex. The sex field was a required field, denoted by an asterisk.

92. During the 2023-24 admissions cycle, Wharton maintained a partnership with the Forté Foundation. Under that partnership, Wharton itself identified and selected Forté Fellows — recipients of an award available to women — from among applicants to its MBA program. Wharton ended that partnership in or about August 2025.

93. The Wharton MBA application for the 2023-24 cycle contained no Forté-specific item, essay, or indication of interest. Candidates for the award were therefore identified from information contained in the general application for admission, which required every applicant to state his or her sex.

94. Penn has not disclosed at what stage of its process Forté Fellows were identified or selected, whether that identification occurred before or after the admission decision, or whether the persons making those determinations also evaluated applications for admission. That information is within Penn's exclusive possession and control and is not ascertainable from any public source.

95. Penn intentionally considered applicants' sex in evaluating applications for admission to the Wharton MBA program during the 2023-24 admissions cycle, and considered Plaintiff's sex in evaluating his application.

96. As a direct and proximate result, Plaintiff suffered the pecuniary injuries described in ¶ 78.

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Declare that Penn's consideration of race in admission to the Wharton MBA program violates Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1981;

b. Enjoin Penn from considering applicants' race in admission to the Wharton MBA program;

c. Award compensatory damages in an amount to be determined at trial;

d. Award nominal damages;

e. Award costs of suit, and attorney's fees pursuant to 42 U.S.C. § 1988 in the event Plaintiff obtains counsel;

f. Grant such other relief as the Court deems just and proper.

## I. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 31, 2026

Respectfully submitted,

/s/ John Doe
John Doe, Plaintiff pro se
PO Box 151133
Los Angeles, CA 90015
(502) 286-3652

johndoediscriminationsuit@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2026, I caused a true and correct copy of the foregoing First Amended Complaint to be served upon counsel of record for Defendant by electronic mail, addressed as follows: James A. Keller, Esq. (James.Keller@saul.com) and Jesse L. Krohn, Esq. (Jesse.Krohn@saul.com), Saul Ewing LLP, 1735 Market Street, Suite 3400, Philadelphia, PA 19103, counsel for Defendant The Trustees of the University of Pennsylvania.

/s/ John Doe
John Doe, Plaintiff pro se