**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

JOHN DOE,
Plaintiff,

v.

THE TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA,

Defendant.

Case No. 2:26-cv-02472-MAK

**SECOND AMENDED COMPLAINT**

Plaintiff John Doe, proceeding pro se and under pseudonym pursuant to this Court's Order of August 24, 2026 (ECF 26), and pursuant to this Court's Order of September 30, 2026 (ECF 30), alleges as follows.

## I. NATURE OF THE ACTION

1. This action arises from Defendant's denial of Plaintiff's application for admission to the full-time MBA program of the Wharton School for the 2023-24 admissions cycle.

2. Plaintiff alleges Defendant considered his race, his sex, and his sexual orientation in evaluating his application and denied him admission on those grounds.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and the events giving rise to the claims occurred in this District.

## III. PARTIES

5. Plaintiff John Doe is an adult individual residing in California, and resided in California at all times relevant to this action, including when he applied for admission. Plaintiff is White, male, and heterosexual.

6. Defendant The Trustees of the University of Pennsylvania ("Penn") is a private university located in Philadelphia, Pennsylvania.

7. The Wharton School ("Wharton") is a school of the University of Pennsylvania and is not a separately incorporated entity. Its MBA program is administered under Penn's institutional authority.

## IV. PLAINTIFF'S APPLICATION AND DENIAL

8. On or about April 2, 2024, Plaintiff submitted an application for admission to the full-time Wharton MBA program for the 2023-24 admissions cycle, for the class entering in the fall of 2024 (the "Class of 2026"). April 2, 2024 was the Round 3 application deadline for that cycle.

9. Plaintiff's application included a GMAT score in the top one percent of test takers.

10. Plaintiff earned a bachelor's degree in a rigorous quantitative science discipline from a state university.

11. At the time he applied, Plaintiff had professional work experience of a duration within the range of admitted applicants.

12. Plaintiff was qualified for admission to the Wharton MBA program.

13. The Wharton MBA application for the 2023-24 cycle required every applicant to state his or her sex. The sex field was a required field, denoted by an asterisk.

14. Plaintiff stated his sex on his application, as the application required.

15. Wharton's MBA Application Guide for the 2023-24 cycle states that every application to the full-time MBA Program is read by two people, each without knowledge of the other reader's feedback. (Ex. J.)

16. Penn has disclosed no procedure by which information bearing on an applicant's race or sex is withheld from the persons who read and evaluate applications for admission.

17. On April 19, 2024, Penn denied Plaintiff's application. Penn did not interview Plaintiff.

18. Penn has not disclosed the criteria applied to Plaintiff's application, the identity of the persons who evaluated it, or what information within it was before those persons. That information is within Penn's exclusive possession and control and is not ascertainable from any public source.

## V. PENN'S RECEIPT OF FEDERAL FINANCIAL ASSISTANCE

19. Penn receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., including federal student financial aid administered under Title IV of the Higher Education Act.

20. Penn's receipt of federal financial assistance extends to programs and activities conducted by the Wharton School, including its full-time MBA program.

## VI. PENN'S ACKNOWLEDGED PRACTICE AND ITS UNDISCLOSED CHANGE

21. The Common Data Set ("CDS") is a standardized annual reporting instrument. Participating institutions complete the CDS themselves and publish the completed form. Penn publishes its completed CDS for each academic year on the website of its Office of Institutional Research & Analysis. (Ex. B.)

22. Section C7 of the CDS requires an institution to rate the relative importance of enumerated academic and nonacademic factors in its admission decisions, using the categories "Very Important," "Important," "Considered," and "Not Considered." In editions of the CDS through the 2022-23 academic year, the enumerated nonacademic factors included "Racial/ethnic status."

23. In its published CDS for the 2022-23 academic year, Penn rated "Racial/ethnic status" as "Considered" in admission decisions. That entry is Penn's own characterization of its own admissions practice, in a document Penn prepared and published. (Ex. B.)

24. On June 29, 2023, the Supreme Court decided *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023).

25. On the same day the decision issued, Penn's President and Provost published a statement to the university community stating that the decision "will require changes in our admissions practices."

26. Penn did not, in that statement or at any time since, identify what those changes were, when any change took effect, which admissions offices or degree programs any change applied to, or what criteria replaced those previously used.

27. Penn has published no post-decision admissions policy, procedure, guidance, or training material describing how applicants' race is or is not treated in its admissions processes.

28. The Common Data Set reports on first-time, first-year undergraduate admission. It does not report on admission to graduate or professional programs, including the Wharton MBA program.

29. No standardized public disclosure describes the relative importance of any factor, including race or sex, in Wharton MBA admission decisions.

30. Penn has therefore publicly acknowledged that its admissions practices as they existed on June 29, 2023 required change, while never describing the change. The particulars of Penn's admissions practices during the 2023-24 cycle are within Penn's exclusive possession and control.

31. Prior to June 29, 2023, the demographic section of Penn's graduate application stated that the requested information would be used to evaluate the effectiveness of Penn's recruitment efforts and to facilitate selection of a diverse student body, and stated that Penn wished to know how the applicant's background, work and life experiences, interests, culture, socioeconomic status, and race and/or ethnicity would contribute to the diversity of the incoming class.

32. In the 2023-24 admissions cycle, the same disclosure omitted the phrase "and to facilitate selection of a diverse student body" and omitted the words "race and/or ethnicity." The remainder of the disclosure was materially unchanged.

33. Both versions of the disclosure stated that the information was confidential and voluntary and that answering a question or omitting an answer would not influence the University's decision on admission.

34. Notwithstanding the deletions described in ¶ 32, Wharton's MBA Application Guide for the 2023-24 cycle lists "Ethnicity (optional)" among the items collected in the Biographical Information section. (Ex. J.)

35. Penn has not stated whether the Wharton MBA application for the 2023-24 cycle requested an applicant's race or ethnicity, and has never stated whether or how the evaluation of applications changed. That information is within Penn's exclusive possession and control.

## VII. PENN'S SEX-BASED SELECTION OF AWARD RECIPIENTS

36. During the 2023-24 admissions cycle, Wharton maintained a partnership with the Forté Foundation. Under that partnership, Wharton itself identified and selected Forté Fellows — recipients of an award aimed at women. Wharton ended that partnership in or about August 2025. (Ex. O, P.)

37. The Wharton MBA application for the 2023-24 cycle contained no Forté-specific item, essay, or indication of interest.

38. Candidates for the award were therefore identified from information contained in the general application for admission, which required every applicant to state his or her sex.

39. Penn has not disclosed at what stage of its process Forté Fellows were identified or selected, whether that identification occurred before or after the admission decision, or whether the persons making those determinations also evaluated applications for admission. That information is within Penn's exclusive possession and control.

## VIII. WHARTON'S PARTICIPATION IN IDENTITY-BASED APPLICANT PROGRAMMING

40. Wharton Out for Business ("O4B") is a student organization of the Wharton School serving LGBTQ+ MBA students. O4B maintains a public website at whartono4b.com.

41. O4B's website states that Wharton attends the Pre-MBA Admissions Summit held by Reaching Out MBA ("ROMBA") each year, and describes that conference as including a networking session with current LGBTQ+ MBA students, panels with school admissions officers, and a business school expo with other MBA programs. (Ex. C.)

42. Wharton presented at the ROMBA Pre-MBA Admissions Summit held on or about August 21, 2024.

43. O4B's website describes programming for prospective applicants including sessions it identifies as "Official AdCom Events," offers applicants the opportunity to speak with a "Queer Admissions Fellow," and directs applicants requiring assistance to an electronic mail address of the Wharton MBA admissions office. (Ex. C.)

44. O4B's website further states that designating oneself as LGBTQ+ on a Wharton MBA application will not positively or negatively affect one's chance for admission, that such information is not shared with anyone outside of Admissions, and that the information is treated as confidential. (Ex. D.)

45. Penn has not disclosed whether, or to what extent, an applicant's participation in programming of the kind described in ¶¶ 41 through 43 is recorded in or considered as part of that applicant's file. That information is within Penn's exclusive possession and control.

## IX. A PUBLICLY REPORTED ADMITTED APPLICANT

46. GMAT Club operates a publicly accessible "Decision Tracker" on which applicants to graduate business programs self-report their application outcomes, test scores, undergraduate grade point averages, years of work experience, location, and sex. (Ex. E.)

47. An entry on that Decision Tracker, posted under the username "Stargirl66," reports an applicant who self-identified as female, located in the United States, with four years of work experience, entering year 2024, a GRE score of 327, and an undergraduate grade point average of 3.4. (Ex. I.)

48. That entry reports that the applicant applied to the Wharton full-time MBA program in Round 2 of 2024, interviewed on February 19, 2024, and was accepted on March 26, 2024 with a seventy-five percent scholarship.

49. That entry reports admission to the same Wharton MBA program, for the same entering class, in the same admissions cycle in which Plaintiff applied and was denied.

50. A second entry on that Decision Tracker, posted under the username "A777777," reports an applicant with five years of work experience, location Turkey, entering year 2024, a GRE score of 326, and an undergraduate grade point average of 3.22. Plaintiff alleges, on information and belief, that the race of the applicant differed from Plaintiff's race. The Decision Tracker does not report that applicant's race, and it is not ascertainable from any public source. (Ex. H.)

51. That entry reports that the applicant applied to the Wharton full-time MBA program in Round 1 of 2024, interviewed on November 23, 2023, and was accepted on December 15, 2023.

52. Both entries report admission to the same Wharton MBA program, for the same entering class, in the same admissions cycle in which Plaintiff applied and was denied.

53. Plaintiff's standardized test percentile is higher than that of either applicant described above. Plaintiff's undergraduate grade point average is lower than that reported by the first applicant and higher than that reported by the second.

54. Plaintiff does not know, and cannot ascertain from any public source, the full contents of either applicant's file, the identity of the persons who evaluated it, or the criteria applied to it.

## X. PUBLISHED ADMISSIONS AND TESTING DATA

55. Wharton published that its MBA Class of 2026 enrolled 866 students from an applicant pool of 7,322, with an average GMAT score of 732 and an average undergraduate grade point average of 3.7. (Ex. R.)

56. Wharton states that there is no minimum GMAT or GRE score requirement to apply to its MBA program and that it has no preference for one test over the other. Wharton further states that its published GMAT average "represents only GMAT scores from the legacy exam." (Ex. R.)

57. The Graduate Management Admission Council ("GMAC") published, for testing year 2018, that among unique United States Black or African American GMAT examinees numbering 4,701: four percent scored 700 or above; five percent scored 650 to 690; seven percent scored 600 to 640; nine percent scored 550 to 590; ten percent scored 500 to 540; and sixty-four percent scored below 500.

58. GMAC published that fifteen percent of those examinees reported an undergraduate grade point average of 3.6 or higher, compared with thirty-six percent of non-underrepresented United States examinees.

59. Wharton published that six percent of its MBA Class of 2026 identify as Black or African American. Wharton published that the underlying data "represents the 71% of students that are U.S. passport holders only" and that the "[p]ercentages are calculated out of 866 students." (Ex. R.) Six percent of 866 students is approximately 52 students.

60. Plaintiff states the following assumptions expressly, and alleges that each is an assumption he cannot verify without discovery and not a statement of fact:

(a) that the testing year 2018 distribution described in ¶ 57 approximates the distribution of scores among applicants in the 2023-24 admissions cycle;

(b) that the national distribution described in ¶ 57 approximates the distribution among Wharton's applicants specifically;

(c) that the applicants to the Class of 2026 drew substantially from a single testing year;

(d) that the students described in ¶ 59 submitted GMAT scores rather than GRE scores;

(e) that the six percent figure described in ¶ 59, which Wharton published as calculated out of 866 students, corresponds to approximately 52 students who submitted GMAT scores from the legacy exam; and

(f) that the examinees described in ¶ 57 are the relevant pool from which the students described in ¶ 59 were drawn.

61. GMAC's published figure that four percent of the 4,701 examinees scored 700 or above corresponds to approximately 188 examinees. The number of those 188 examinees scoring above Wharton's published average of 732 depends on how scores are distributed across the range from

700 to 800: approximately 128 if that distribution is uniform, approximately 94 if its density declines linearly, and approximately 66 if its density declines steeply. Fitting a normal distribution to the bands described in ¶ 57 and truncating that distribution at the maximum attainable score of 800 yields approximately 81.

62. Subject to the assumptions stated in ¶ 60, in order for every student described in ¶ 59 to have scored at or above Wharton's published average, Wharton would have had to enroll between approximately forty-one percent and approximately seventy-nine percent of all Black or African American United States examinees scoring above that average in a testing year.

63. Many other graduate business programs publish average GMAT scores within a narrow range of Wharton's published average, and draw their applicants from the same national pool of examinees described in ¶ 57.

64. Subject to the assumptions stated in ¶ 60, and upon information and belief, Plaintiff alleges that the distribution of objective academic credentials among students admitted to the Wharton MBA Class of 2026 differs by race and by sex, and that the average standardized test score of admitted students who are Black or African American was lower than that of admitted students who are not. The actual distributions are within Penn's exclusive possession and control.

## XI. WHARTON'S RACE-LINKED FELLOWSHIP MATERIALS

65. Wharton maintains a page on its corporate and recruiter website describing scholarship and fellowship opportunities. That page describes the Howard E. Mitchell Fellowship as a pooled fund for exceptional students from underrepresented backgrounds who receive full tuition and engage in leadership programming. (Ex. F.)

66. That page hyperlinks to a document published by Wharton and hosted on Wharton's domain, which states that partnering with corporations and foundations allows Wharton to give annually ten merit-based, full-tuition awards to extraordinary students, with a preference for underrepresented groups identified as African Americans, American Indians, Hispanics and women. (Ex. G.)

67. Wharton's current MBA financial aid materials do not describe the Howard E. Mitchell Fellowship or its eligibility criteria. Those materials describe a Wharton Fellowship Program for which all admitted students are considered based on the application for admission, with awards offered in the admission and financial aid letter.

68. Penn has not stated whether the criteria described in ¶ 66 were changed, when any change took effect, or what criteria currently govern the award.

69. Penn has not disclosed at what stage of its process the recipients of the award described in ¶¶ 65 and 66 were identified or selected, whether that identification occurred before or after the admission decision, or whether the persons making those determinations also evaluated applications for admission. That information is within Penn's exclusive possession and control.

## XII. PENN'S PUBLICATION AND WITHDRAWAL OF DEMOGRAPHIC FIGURES

70. In October 2024, a University publication reported that demographic figures published by the Wharton School showed a decline in the percentage of students from historically underrepresented groups in its most recent undergraduate and MBA classes. (Ex. K.)

71. Following publication, a Wharton spokesperson stated that the School had identified inconsistencies between the methodologies used to calculate the figures for the two class years compared, rendering year-over-year comparison inaccurate. (Ex. L.)

72. Wharton did not publish recalculated figures. When asked to provide the corrected demographic information, the spokesperson declined and directed the publication to Penn's University-wide class profile. (Ex. L.)

73. Wharton further stated that future demographic data would be reported through the annually released University-wide class profile, which contains less information than the school-level data Wharton had previously made publicly available. (Ex. L.)

74. Penn published demographic figures, disclaimed their accuracy, declined to provide corrected figures when asked, and reduced the granularity of its subsequent public reporting. Penn has not stated what the corrected figures were.

## XIII. INFORMATION BEFORE THE PERSONS WHO EVALUATED PLAINTIFF'S APPLICATION

75. The Wharton MBA Application Guide directs applicants to address their personal, professional, and academic background in a required essay describing their intended contributions to the Wharton community. The application separately provides fields for community honors and for extracurricular activities and community engagements, each with a description. (Ex. J.)

76. The Personal Information section of the Wharton MBA application requests the first and last name of the applicant's spouse, spouse-to-be, or partner, together with that person's country, city, college or colleges, degrees, current employer, and current position. The application also

requests the names, educational institutions, and employment information of the applicant's parents and siblings. (Ex. J.)

77. Information of the kind described in ¶¶ 13, 75, and 76 allows inferences as to the race, sex, and sexual orientation of the applicant and of the applicant's family members.

78. Plaintiff does not allege that Penn's collection of the information described in ¶¶ 75 and 76, or of an applicant's sex, is itself unlawful. Plaintiff alleges that Penn has not disclosed whether or how that information is used in evaluating an application for admission, and that the Department of Education permits an inquiry as to an applicant's sex only where the question is asked of applicants of both sexes and the resulting information is not used for a discriminatory purpose. 34 C.F.R. § 106.21(c).

79. Commercially available software tools are capable of redacting from application materials information from which race, sex, and age may be inferred. Upon information and belief, Penn employs no such tool in its MBA admissions process.

80. The information described in ¶¶ 13, 75, and 76 was contained in the materials Plaintiff submitted to Penn. Penn has disclosed no procedure by which that information, or information from which an applicant's race, sex, or sexual orientation may be inferred, is withheld from the persons who read and evaluate applications for admission, and upon information and belief Penn employs no tool of the kind described in ¶ 79. The persons who evaluated Plaintiff's application therefore had available to them the means by which an applicant's race, sex, or sexual orientation could be taken into account. Whether it was taken into account is within Penn's exclusive possession and control.

**COUNT I — Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

81. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

82. Title VI provides that no person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d.

83. Penn receives federal financial assistance. Its MBA program is a program or activity within the meaning of Title VI.

84. Plaintiff is White.

85. Plaintiff was qualified for admission to the Wharton MBA program.

86. Penn intentionally considered applicants' race in evaluating applications for admission to the Wharton MBA program during the 2023-24 admissions cycle, considered Plaintiff's race in evaluating his application, and denied him admission on the ground of his race.

87. As a direct and proximate result, Plaintiff suffered pecuniary injury including an application fee of $275 and examination fees of $500, together with diminished earning capacity in an amount to be determined at trial.

**COUNT II — Violation of 42 U.S.C. § 1981**

88. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

89. Section 1981 guarantees to all persons the same right to make and enforce contracts as is enjoyed by white citizens, and protects white persons as well as members of racial minorities. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976). Section 1981 reaches a private school's refusal to contract on racial grounds. *Runyon v. McCrary*, 427 U.S. 160 (1976).

90. Plaintiff is a member of a racial group.

91. Admission to and enrollment in Penn's MBA program, in exchange for tuition, would have created a contractual relationship between Plaintiff and Penn.

92. Penn intentionally discriminated against Plaintiff on the basis of race in refusing to enter into that contractual relationship. But for Plaintiff's race, Penn would not have denied his application.

93. As a direct and proximate result, Plaintiff suffered the injuries described in ¶ 87, together with non-pecuniary injury.

**COUNT III — Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681**

94. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

95. Title IX provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). Title IX is enforceable through an implied private right of action, and damages are available for intentional violations.

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992).

96. Plaintiff brings this Count on the basis of sex. Plaintiff further alleges that Penn's consideration of an applicant's sexual orientation is discrimination on the basis of sex within the meaning of 20 U.S.C. § 1681(a), because an applicant's sexual orientation cannot be ascertained or acted upon without reference to that applicant's sex. See *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (construing the phrase "because of . . . sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)).

97. Penn's MBA program is an education program or activity receiving federal financial assistance.

98. Plaintiff is male and heterosexual.

99. The Wharton MBA application required each applicant to state his or her sex. The sex field was a required field, denoted by an asterisk.

100. Wharton itself identified and selected the recipients of an award aimed at women, as alleged in ¶¶ 36 through 39.

101. The Wharton MBA application permits an applicant to designate himself or herself as LGBTQ+, as alleged in ¶ 44. Wharton participates in programming directed to prospective applicants on the basis of sexual orientation, including sessions identified as "Official AdCom Events" and access to a "Queer Admissions Fellow," as alleged in ¶¶ 41 through 43. Penn has not disclosed whether an applicant's designation or participation in such programming is recorded in or considered as part of that applicant's file, as alleged in ¶ 45.

102. Penn intentionally considered applicants' sex in evaluating applications for admission to the Wharton MBA program during the 2023-24 admissions cycle, considered Plaintiff's sex in evaluating his application, and denied him admission on the basis of his sex.

103. Penn intentionally considered applicants' sexual orientation in evaluating applications for admission to the Wharton MBA program during the 2023-24 admissions cycle, considered Plaintiff's sexual orientation in evaluating his application, and denied him admission on the basis of his sexual orientation.

104. As a direct and proximate result, Plaintiff suffered the pecuniary injuries described in ¶ 87.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Declare that Penn's consideration of race, sex, and sexual orientation in admission to the Wharton MBA program violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Title IX of the Education Amendments of 1972;

b. Enjoin Penn from considering race, sex, or sexual orientation in evaluating applications for admission to the full-time MBA program of the Wharton School;

c. Award compensatory damages in an amount to be determined at trial;

d. Award nominal damages;

e. Award costs of suit, and attorney's fees pursuant to 42 U.S.C. § 1988 in the event Plaintiff obtains counsel; and

f. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 15, 2026

Respectfully submitted,

/s/ John Doe
John Doe, Plaintiff pro se
PO Box 151133
Los Angeles, CA 90015
johndoediscriminationsuit@gmail.com
(502) 286-3652

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2026, I caused a true and correct copy of the foregoing Second Amended Complaint, together with Exhibit A, to be served upon counsel of record for Defendant by electronic mail, addressed as follows: James A. Keller, Esq. (James.Keller@saul.com) and Jesse L. Krohn, Esq. (Jesse.Krohn@saul.com), Saul Ewing LLP, 1735 Market Street, Suite 3400, Philadelphia, PA 19103, counsel for Defendant The Trustees of the University of Pennsylvania.

/s/ John Doe
John Doe, Plaintiff pro se